KUKLA PRESS, INC., Plaintiff-Appellee, v. FAMILY MEDIA, INC., Defendant-Appellant (Country Music Magazine, Inc., Defendant).
First District (2nd Division)   No. 84—2189

Opinion filed June 11, 1985.

Antonow & Fink, of Chicago (John H. Ward, of counsel), for appellant.

Robert Boehm & Associates, Ltd., of Chicago (Mark D. Pearlstein and Henry B. Merens, of counsel), for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This is a breach of contract action brought by plaintiff Kukla Press, Inc. against defendants Country Music Magazine, Inc. (Country Music), and Family Media, Inc. (Family Media), for nonpayment of certain printing work ordered by Country Music from plaintiff

through plaintiff's affiliate, Shamrock Litho, Inc. (Shamrock).

On August 20, 1981, Country Music ordered printing work from plaintiff, through Shamrock, for the sum of $15,792.61 on open account. Bridget Spiess, an employee of Shamrock, acted as a broker and agent for plaintiff in procuring Country Music's printing work. On October 28, 1981, due to financial difficulties, Country Music hired Family Media, a group with extensive magazine publishing experience, to manage Country Music. Paragraph 8(a) of the management agreement provided that "Family Media shall be in no way liable for any debts of the Company [Country Music]." Paragraph 1(i) provided that Family Media had full authority to "authorize and make payments (including issuing checks) for the Magazine."

Family Media then contacted various creditors of Country Music, including Shamrock. In the affidavit of Robert Riordan, the president of Family Media, he stated that all such discussions between Shamrock, as representative of plaintiff, were held by Family Media solely and explicitly as the manager of Country Music and not on behalf of Family Media itself. Two discussions between Family Media and Shamrock are relevant here.

On November 4, 1981, Stanley Shikora, vice-president and treasurer of Family Media, met with Peter Hughes of Shamrock to discuss plaintiff's claims against Country Music. Shikora stated in his affidavit that he expressly informed Hughes that Family Media was not responsible for any debts of Country Music and that, as manager of Country Music for its owners, Family Media was endeavoring to cause Country Music to pay its debts, including those owed to plaintiff. He further stated that he never indicated that Family Media would pay any of Country Music's debts and that he expressly informed Hughes that Country Music alone was responsible for Country Music's debts. Plaintiff's affiant, Richard Hilke, vice-president of Kukla Press, although he was not actually present during the discussion between Shikora and Hughes, stated that Shikora told Hughes that Family Media would pay the past-due obligations of Country Music. No affidavit of Hughes was presented.

The November 4, 1981, conversation between Shikora and Hughes was confirmed by a letter written the same day by Shikora to Hughes. This letter was the first of two letters by Family Media enforced by the trial court as a guarantee. The letter provided in full:

> "It was a pleasure to meet you today and to have been given the opportunity to tell you in person our plans for Country Music as they affect you.

It is our intent to pay all Country Music's accounts payable, which for Shamrock is approximately $1620 and for Kukla, your affiliated company, is approximately $16,400. I am unable, however, to give you an exact schedule of payments for another week or so, but in the meantime feel free to keep in touch with me.

/s/ Stanley Shikora
Vice President and Treasurer."

The letter was written on Family Media's letterhead.

The next meeting took place on January 5, 1982, between Bridget Spiess of Shamrock and Robert Riordan, president of Family Media. In his affidavit Riordan stated that he specifically informed Spiess that Family Media was acting solely as the manager of Country Music, Family Media neither had nor was assuming any liability or obligation for any of Country Music's debts, and that all payments of those debts would be made solely by Country Music. Plaintiff's affiant, Hilke, again stated that at that meeting, though he was not actually at the meeting, Family Media promised to pay the debts of Country Music. Plaintiff did not submit an affidavit from Spiess.

The January 5, 1982, conversation was confirmed by a letter from Riordan to Spiess. This letter is the second of two letters written by Family Media enforced by the trial court as a guarantee. The letter provided in full:

"This will confirm today's conversation wherein we agreed to pay you the balance due of $15,792.61 in four equal installments of $3,948.15 on the first of February, March, April and May 1982. If it is possible to pay you sooner, as we go along, we will make every effort in this direction.

/s/ Robert Riordan
President."

This letter was also written on Family Media's letterhead.

Consistent with the timetable listed in the January 5, 1982, letter, Family Media caused Country Music to make a payment to plaintiff. This was done by Country Music's check No. 284 dated February 4, 1982, signed by Stanley Shikora and another person. The check was duly negotiated by plaintiff and the payment credited against Country Music's indebtedness, reducing it to $11,844.46.

During February of 1982, it became apparent that Country Music was not going to survive as a business concern. Consequently, Family Media terminated its management agreement in accordance with its terms. Country Music then obtained an assignment for the

benefit of creditors under New York law. Plaintiff filed suit in Cook County against both Country Music and Family Media, seeking the balance owed it plus interest. Both sides filed motions for summary judgment. Plaintiff attached an affidavit for its vice-president, Richard Hilke, in support of its motion and another in opposition to Family Media's motion. Family Media attached the affidavits of its president, Richard Riordan, and its vice-president and treasurer, Stanley Shikora, as well as a motion to strike alleged hearsay statements from the affidavit of Hilke. In a memorandum opinion, the trial court denied Family Media's motions and granted plaintiff's. Family Media appeals the entry of summary judgment against it seeking a reversal of that order and entry of judgment in its favor.

Summary judgment will only be granted if the pleadings, affidavits and depositions on file disclose no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. (*Kroll v. Sugar Supply Corp.* (1983), 116 Ill. App. 3d 969, 975, 452 N.E.2d 649.) Upon review of the trial court's entry of summary judgment, the appellate court determines whether the trial court was correct in ruling that no genuine issue of material fact was raised, and if none was raised, whether entry of the judgment was correct as a matter of law. (*Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 938, 453 N.E.2d 1133.) Summary judgment "is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt his right thereto." *Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 605, 456 N.E.2d 958.

▪ The first issue for review is whether the trial court erred in failing to strike portions of Hilke's affidavit. Family Media alleges that the following paragraph in each of Hilke's affidavits should have been stricken as hearsay:

"On or about November 4, 1981, and January 5, 1982, certain officers of Family Media, Inc. told Peter B. Hughes and Bridget Spiess of Shamrock Litho, Inc. that Family Media would pay the past due obligation of Country Music Magazine, Inc. to Kukla Press, Inc."

Under Supreme Court Rule 191, affidavits in support of or in opposition to a motion for summary judgment "shall be made on the personal knowledge of the affiants *** shall *** consist of *** facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto. If all the facts to be shown are not within the personal knowledge of one person, two or more affidavits shall be used." 87 Ill. 2d R. 191(a).

The alleged statements by Family Media to Spiess and Hughes, as between those persons, would not be hearsay. The statements themselves would have independent legal significance as words of contract and would fall outside the hearsay rule. Between Hilke, Spiess and Hughes, however, the statements are hearsay. Hilke cannot relate what someone else told him that Family Media said. Consequently, since those statements were not within the personal knowledge of Hilke by virtue of his absence from those meetings, that portion of each of his affidavits should have been stricken pursuant to Family Media's motion.

■ The next issue is whether the two letters written to Shamrock were properly determined to be unambiguous letters of guarantee, thereby precluding the introduction of parol evidence offered by Family Media in its affidavits. For the following reasons, we find that the letters, read separately and together, are ambiguous and warrant the introduction of parol evidence to explain or supplement the writings to determine the true intent of the drafters, but not to alter or vary explicit terms therein.

An examination of the two letters reveals that the first letter, dated November 4, 1981, was no more than a noncommittal letter of intent by Family Media to work out the financial arrangements of Country Music's debt with Shamrock. The trial court could not determine, as a matter of law, that the November 4 letter was an unconditional promise by Family Media to act as a guarantor for Country Music's debts. However, since some indicia of commitment by Family Media can be gleaned from that letter, although it is incomplete in terms of the exact amounts owed and guaranteed and as to the method or schedule of payments, it must be read with reference to the letter dated January 5, 1982.

The letter dated January 5, as quoted above, is ambiguous on its face and when read with the November 4 letter for three reasons. "When a contract is ambiguous or unclear so that the intentions of the parties cannot be discerned from the contract itself, the court may look to extrinsic evidence to make a proper interpretation of the contract." (*First National Bank v. Minke* (1981), 99 Ill. App. 3d 10, 14, 425 N.E.2d 11.) Whether an ambiguity exists is a question of law. (*Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 575, 414 N.E.2d 1152.) An ambiguity refers to an obscurity in meaning "through indefiniteness of expression, or having a double meaning." 91 Ill. App. 3d 573, 575.

The November 4 letter itself creates the first ambiguity in that it lacks reference to definite amounts owed, lacks any evidence of

consideration, lacks exact time and method of payment, and lacks any reference to the duration of the alleged guarantee or to whom the alleged guarantee is being extended. Though much of that indefiniteness is cured in the letter dated January 5, that letter itself creates two ambiguities. The January 5 letter recites that "we agreed to pay you." When read in conjunction with the language in the November 4 letter, "our plans for Country Music" and "our intent to pay all Country Music's accounts payable," it becomes unclear whether the "we" and "our" refers to Family Media alone or Family Media as representative of Country Music. That ambiguity requires the examination of extrinsic evidence in order to become clear. Plaintiff's citation to *Herbert H. Rozoff Associates, Inc. v. Purity Corp.* (1977), 56 Ill. App. 3d 1, 371 N.E.2d 976, is not persuasive because in that case, the letter stated: " 'I will personally guarantee [corporation's] current account with [public relations firm] and I hope that our press conference will be a resounding success.' " (56 Ill. App. 3d 1, 2.) The court there was correct in determining that no ambiguity existed under the circumstances present. The plaintiff there agreed to continue work on behalf of the defendant upon the personal guarantee of George Sullivan, the man who signed the letter quoted above. At trial, Sullivan wanted to show from portions of his deposition that his guarantee promise was contingent upon the defendant's approval of plaintiff's work. No such argument is raised here, and this court is not presented with such an unambiguous document as in the *Purity* case.

The third ambiguity is created by Family Media's argument that it was only acting as Country Music's agent when negotiating with Shamrock and that it sent the letters in its capacity as Country Music's agent. The November 4 letter refers to the alleged principal here, Country Music, and contains the signature of Shikora, a representative of Family Media who also signed the check for Country Music. The January 5 letter has Country Music's name written on it in cursive and is signed by Riordan, a representative of Family Media who was also president of Country Music at that time. In that there is no overt or specific reference to the agency relationship between Family Media and Country Music, an ambiguity is created warranting the hearing of parol evidence to determine the capacity in which the parties intended the representatives of Family Media to sign. *Charles Selon & Associates, Inc. v. Estate of Aisenberg* (1981), 103 Ill. App. 3d 797, 799, 431 N.E.2d 1214; *First National Bank v. Achilli* (1973), 14 Ill. App. 3d 1, 5, 301 N.E.2d 739.

■ As stated, Family Media argues that it was acting in the ca-

pacity of managing agent for Country Music when negotiating with Shamrock, and the record indicates that both Riordan and Shikora must have been working for Country Music in an officer's capacity at the same time, Riordan as president and Shikora in an unclear capacity. Given the nature of the letters, ambiguities are created justifying reference to parol or other extrinsic evidence in determining the intent of the parties and the capacity of Riordan and Shikora when dealing with Shamrock. We therefore reverse the decision of the trial court and remand for a hearing to resolve those questions. On remand, if Family Media is found to be a disclosed agent of Country Music, or if it is found that plaintiff knew Family Media was acting in an agency capacity, then Family Media would not be liable for the sums owed by Country Music. A disclosed agent is generally not liable for the debts incurred on behalf of a principal. *McCorkle v. Weinstein* (1977), 50 Ill. App. 3d 661, 663, 365 N.E.2d 953.

■ Plaintiff argues, however, that its affiant Hilke averred that he was never aware that Family Media was acting as an agent for Country Music and that it was his understanding that Family Media was to pay the debt directly to Kukla Press. Hilke admits, though, that Shamrock was its agent in securing work from Country Music. While this does not suggest that Shamrock is always acting as plaintiff's agent, it does seem implausible that Shamrock was negotiating plaintiff's unpaid account with Family Media on its own accord without any concern for plaintiff. Plaintiff is based in the Chicago area. All other parties involved in this suit are based in New York with all transactions having occurred in New York. It seems more likely that, on remand, it will be determined that Shamrock was acting as plaintiff's agent in this transaction as well. If that is the case, the law is settled that "a principal is deemed to have knowledge of all material facts of which his agent receives notice or acquires knowledge, while acting in the course of his employment and the scope of his authority." *Kuska v. Folkes* (1979), 73 Ill. App. 3d 540, 544, 391 N.E.2d 1082.

Reversed and remanded.

PERLIN and BILANDIC, JJ., concur.