SECOND DIVISION

No. 1-09-1020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07 CR 13619 |
| | ) | |
| KAREN BAILEY, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Karnezis concurred in the
      judgment and opinion.

**OPINION**

On January 27, 2009, the trial court found defendant guilty of four counts of financial

exploitation of an elderly person and two counts of theft. The evidence showed that in less than

one year, defendant had taken and depleted the life savings -- over $300,000 -- from a woman

who suffered from dementia severe enough that she was not able to understand and manage her

financial affairs. That included several bank accounts and monthly railroad retirement pension

deposits. In perpetrating her crimes, the defendant used two dubious documents, a general power

of attorney that had terminated due to the incompetence of the principal and a durable power of

attorney. After finding defendant guilty, the trial court sentenced her to concurrent sentences of

No. 1-09-1020

11 years' incarceration in the Illinois Department of Corrections. Defendant then appealed to this court, raising six issues on appeal. First, defendant argues that the trial court erroneously sustained certain hearsay objections during the testimony of the defense's sole witness. Second, defendant argues that the trial court mischaracterized significant portions of the evidence presented at trial. Third, defendant maintains that the State failed to prove beyond a reasonable doubt either that the victim was incapable of authorizing defendant's various uses of the victim's money or that defendant had notice that her power of attorney had been terminated. Fourth, defendant argues that her sentencing was improper because the trial court considered two improper factors in aggravation. Fifth, defendant also argues that her sentences are excessive. Finally, defendant argues that all but one of her convictions should be vacated pursuant to the one-act, one-crime doctrine. For the following reasons, we affirm.

## JURISDICTION

The circuit court sentenced defendant on April 9, 2009. Defendant timely filed her notice of appeal on April 13, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, which govern appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, §6; Ill. S. Ct. R. 603 (eff. July 1, 1971); R. 606 (eff. March 20, 2009).

## BACKGROUND

The victim in this case, Mary Ann Wilson, is an octogenarian, who has been diagnosed with dementia and is currently living in a nursing home. She had been living with her husband,

Charles Wilson, at their home on the south side of Chicago until his death in 1993. She remained in the home following her husband's death until 2006 when she entered a nursing home. During the period before entering the nursing home, she had lived frugally and amassed savings of over $300,000 in her various bank and investment accounts. But beginning in 2005, defendant acquired wrongful control over the victim's finances and drained her life savings.

A grand jury indicted defendant on four counts of financial exploitation of an elderly person (720 ILCS 5/16-1.3(a) (West 2008)) and eight counts of theft ( four counts pursuant to section 16-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/16-1(a)(1) (West 2008)) and four counts pursuant to section 16-1(a)(2) (720 ILCS 5/16-1(a)(2) (West 2008))). The State proceeded against defendant on counts I through VIII and nol-prossed counts IX through XII. Defendant waived her right to a jury trial and the State proceeded by way of a bench trial beginning on January 5, 2009. The following evidence was presented at trial.

The State called Dr. Dominic Gaziano, who testified as an expert witness in internal medicine, with a specialty in geriatric medicine. Dr. Gaziano saw the victim when she was admitted to St. Mary of Nazareth Hospital on May 3, 2006. When she was admitted, the victim presented with dementia, Parkinson's disease-like symptoms, a urinary tract infection, and dysphasia. Dr. Gaziano testified that on that date, the victim was suffering from severe dementia such that she could not make routine day-to-day decisions. He further testified that after reviewing the victim's medical records, including various diagnostic scans taken as far back as 2002, in his opinion the victim was suffering from dementia when she was hospitalized in May

No. 1-09-1020

2004. The sort of dementia from which the victim suffered -- vascular dementia -- was a type that progressed slowly over time; it did not come on suddenly. On direct examination, Dr. Gaziano testified as follows:

> "Q. Could you consider a person who has any type of dementia
>
> to be competent to make decisions, such as granting a person
>
> control over all of their financial transactions?
>
> A. No, I would not suspect so."

Dr. Gaziano reiterated this opinion on redirect examination:

> "Q. If someone is diagnosed, again I am sorry if I am being
>
> repetitive, if someone is diagnosed with dementia, whether severe
>
> or just a general diagnosis of dementia, Doctor, you stated it's your
>
> opinion within a reasonable degree of medical certainty that that
>
> person is not capable of making financial decisions for
>
> themselves?
>
> A. Yes."

Following Dr. Gaziano's testimony, the State entered three agreed stipulations into evidence. First, the victim, Mary Ann Wilson was born on April 16, 1920, and at the time of trial resided at a nursing home in Chicago. Second, records made by AOL in the regular course of business identified a certain e-mail address and account as belonging to defendant. Third, the State entered into evidence a genuine copy of a durable power of attorney dated January 16,

4

2004, presented by defendant by way of motion and sworn affidavit, and filed June 7, 2006, in support of her position in probate case number 06 P 3549; a genuine copy of Mary Ann Wilson's last will and testament dated January 16, 2004; a genuine copy of an advanced healthcare directive dated January 16, 2004; and a genuine copy of general power of attorney dated January 15, 2004.

Michael Kenney, the owner of legacywriter.com, a web-site that sells legal documents, testified next for the State. Kenney identified the various documents previously stipulated to by the parties and entered into evidence -- the durable financial power of attorney, healthcare power of attorney, last will and testament, and advanced healthcare directive -- as documents ordered from his web-site by someone using defendant's e-mail address. Kenney further testified that his company received two e-mails from defendant's e-mail address requesting assistance in completing her purchase of the documents. Those e-mails were sent on the morning of April 20, 2006. The account associated with defendant's e-mail address was created in February 2006. In addition, Kenney testified that the durable power of attorney form signed and dated in January 2004 was not available for purchase until August 2004. The advanced healthcare directive was not available until June 2004, and the healthcare power of attorney form was not available for purchase until April 2005.

Following Kenney's testimony, the State entered several agreed stipulations regarding the amount of money contained in Mary Ann Wilson's various bank accounts. As of August 1, 2005, she had over $291,000 in three separate bank accounts. She had an investment account at

UBS Financial Services, with a balance of over $185,000. She also had over $79,000 in a checking account and over $26,000 in a money market account at LaSalle National Bank. Prior to June 9, 2005, she was living off of her railroad retirement checks and barely withdrew any funds from her three accounts. Instead, the balances in those accounts increased as she deposited United States Treasury retirement checks. As of April 20, 2006, just over $4,000 remained in Wilson's three accounts.

Arnetta Williams, Mary Ann Wilson's cousin, testified next for the State. Williams was appointed Wilson's temporary guardian on May 15, 2006, and was later appointed Wilson's legal guardian in July 2006. The two women became acquainted during the 1980s and formed a friendship through the 1990s. Sometime during 2004 and 2005 -- Williams could not testify as to the exact date -- Williams became worried about Wilson's well-being. Williams testified that she first became concerned during a telephone conversation with Wilson in which Wilson was incoherent and barely able to communicate. Williams telephoned Wilson repeatedly after that but Wilson did not answer the phone. Instead, Clifford Service, whom Williams believed to be Wilson's friend, answered the phone and would offer various excuses as to why Wilson could not come to the phone at that time. During one telephone call in March 2004, Williams became alarmed when Clifford told her that Wilson could not come to the telephone because she had been hospitalized. In April 2006, when Williams telephoned and was told that Wilson was asleep, she demanded that Clifford wake Wilson up and put her on the phone. Williams testified that when Wilson came to the phone, all Williams could hear was moans.

That same month, Williams traveled to Wilson's home to ascertain her condition in person. Wilson's home was dark and "totally smelling." Wilson lay stiff on her bed, flat on her back, covered in urine and feces. She could move her head from side to side a little bit but made no other movements. Williams testified that Wilson's physical condition remained like this during subsequent visits that she made during April 2006. During these visits, Williams observed that Wilson's clothing and shoes were missing. Williams did not observe any signs of renovation or other improvements to Wilson's house.

When she visited Wilson's home, Williams sometimes observed defendant and David Service, defendant's husband, present at the house. David drove two different vehicles: a Chrysler PT Cruiser and a new-looking white pickup truck displaying a Kunes Country Ford decal.

On May 3, 2006, a crisis nurse from the City of Chicago department of aging removed Wilson from her home and had her admitted to St. Mary of Nazareth Hospital. Williams testified that at the time of her admission to the hospital, Wilson was "unkempt, pale, confused, unable to really speak." After observing Wilson in the hospital, Williams contacted Wilson's brother, who commenced proceedings that eventually named Williams as Wilson's legal guardian.

As Wilson's legal guardian, Williams now has care and control of Wilson's financial affairs. Williams testified that she has sold Wilson's home in order to help cover the cost of Wilson's nursing home care. However, even with the sale of the house, Wilson's remaining funds are insufficient to continue to fund her nursing home care.

Chicago police detective Terance Nalls testified next for the State. Detective Nalls was assigned to investigate a report of financial abuse against Mary Ann Wilson made in August 2006. During his investigation, Detective Nalls attempted to interview Wilson but she was unable to communicate or respond to his questions. After a 10-month investigation, Detective Nalls arrested defendant outside her place of employment.

Defendant then filed a motion *in limine* to exclude Dr. Gaziano's testimony that, in his opinion, Wilson suffered from dementia in May 2004. The parties agreed that the portion of Dr. Gaziano's answer giving his opinion would be stricken. However, the remainder of Dr. Gaziano's answer, in which he testified to reviewing medical records from May 2004 and that those records established that Wilson suffered from dementia in May 2004, remained in evidence.

Trial proceedings then resumed and Marion Eppright, a Special Agent with the United States Railroad Retirement Board, Inspector General's Office, Office of Investigation (hereinafter Retirement Board or Board), testified for the State. Eppright testified that on June 7, 2007, he was assigned to investigate a possible fraud upon Mary Ann Wilson, who received railroad retirement benefits as the spouse of a deceased railroad worker. Wilson began receiving railroad retirement benefit checks in 1993 following the death of her husband. On November 15, 2005, defendant had mailed a letter to the retirement board, enclosing a general power of attorney. The letter explained that Wilson was no longer able to conduct her own financial affairs and requested that all uncashed checks issued to Wilson during October and November 2005 be reissued and mailed to defendant's address. In response to defendant's letter, the

8

Retirement Board telephoned defendant and left a message on her answering machine instructing her to contact the Board's local field office in order to set herself up as a "representative payee" for Wilson.

Eppright explained that in the case of individuals receiving railroad retirement benefits who cannot handle their own financial affairs, the Board does not consider powers of attorney and instead requires that persons acting on behalf of the payee apply to become a "representative payee" and go through a Board screening process to determine their eligibility for the role. After a person has been designated as a "representative payee," that person must perform an accounting of all monies received on the beneficiary's behalf. Defendant never applied to become Wilson's "representative payee."

On January 5, 2006, the Joliet office of the Board received a change of address request signed "Mary Ann Wilson" and dated December 24, 2005. Beginning on January 6, 2006, the Board mailed Wilson's checks to defendant's address. On June 2, 2006, Arnetta Williams was designated Wilson's "representative payee" and began receiving all checks and correspondence to Wilson.

Eppright further testified that on February 16, 2006, defendant e-mailed the Board and asked it to reissue all uncashed checks to Wilson from the period of January 2004 through December 2005. The Board reissued numerous checks and mailed them to defendant's address. The checks issued between January and October 2004 were endorsed with a signature stamp in Wilson's name and were processed by LaSalle Bank. The majority of checks issued beginning in

November 2004 were endorsed by defendant, with the initials "POA" after her signature, and were processed by Credit Union One.

After the State rested its case, the defense presented stipulation testimony of Donald Debit, a certified elder abuse caseworker employed by Metropolitan Family Services, a contract vendor for the Illinois Department of Aging. If called to testify, Debit would have testified that he visited the residence of Clifford Service and Mary Ann Wilson on March 27, 2006, and during that visit did not observe any indication of incontinence or unsanitary conditions. On April 26, 2006, Debit again visited the home of Service and Wilson and found no unsanitary conditions at that time. Debit spoke with Mary Ann Wilson at St. Mary's of Nazareth Hospital on May 6, 2006, and Wilson initiated conversation with him on that date.

The defense then presented its only witness: David Service, defendant's husband. David testified that as of the time of trial, he had been married to defendant for four or five years. Clifford Service is his father. David further testified that he had known Mary Ann Wilson for nearly 40 years. According to David, Wilson and his father began living together sometime during 1992 or 1993 and defendant began joining Wilson and Clifford Service on family outings around the same time.

David testified that on January 16, 2004, he observed Mary Ann Wilson sign a power of attorney. David signed that same power of attorney as a witness. This occurred at the Cook County building in Chicago where Wilson and Clifford Service had come to pick up defendant from her job there.

David testified that he saw Mary Ann Wilson nearly every day when he was not traveling. According to David, Wilson could speak and engage in conversation throughout 2004, and 2005.

In 2005, David drove an older model pickup truck and a Dodge van. At some point during that year, he acquired a new pickup truck. When asked how he paid for the new vehicle, David answered, "My parents bought it for me." David testified that it was his understanding that "Mary Ann was going to give [defendant] the money for me to go get the car. We all went, rode around and looked for the car for a couple of weeks."

David testified that during 2005, he also began work on an addition to the house that he shared with defendant. The addition would allow Clifford Service and Wilson to move in with David and defendant. According to David, Wilson gave defendant money with which to purchase materials for the renovation and hire a contractor to perform the work. Clifford Service would also occasionally help out with the work.

David further testified that Wilson provided him with funds to pay property taxes on a piece of property that he owned in Kankakee County. The property housed horses and, according to David, "we would go [there] on picnics as a family." These outings occurred "daily or at least semi-daily." According to David, Wilson gave defendant the money to pay the property taxes that David owed. On cross-examination, David testified that Wilson often rode the horse that David kept on the Kankakee property. Even though Wilson was 85 years old, had undergone a double hip replacement, and experienced tremors in her hands, David testified that he allowed

Wilson to ride the horse. Furthermore, David never confirmed with Wilson's physician that such activity was safe or appropriate for a woman of her age or condition.

David testified that in December 2005, his brother died and defendant's boss lent David the money to cover funeral expenses. David testified that Wilson told defendant to write a check to repay the loan from defendant's boss. However, on cross-examination, David admitted that his brother actually died sometime in 2004.

David testified that in November 2005, Wilson paid for the bathroom in her home to be remodeled.

On cross-examination, David admitted that defendant was married to another man on January 16, 2004, the date that David witnessed Wilson sign a power of attorney. David testified that despite the fact that defendant was married to another man, he and defendant had been living together for 15 years at that time.

On re-direct examination, David testified that he was concerned that Wilson's relatives might place her in a nursing home and that Wilson's funds would be used to pay for that nursing home care.

The defense rested and the State called Dr. William Evans, a physician specializing in internal medicine, in rebuttal. Dr. Evans examined Wilson in May 2004 when she was admitted to Ingalls Hospital because family members had concerns about her altered mental status. Dr. Evans testified that Wilson "appeared to be demented" when he examined her at the hospital. Moreover, Dr. Evans testified it was his opinion that, with a reasonable degree of medical

certainty, that Wilson suffered from dementia on May 26, 2004. He further testified that Wilson suffered from vascular dementia, which typically develops over a matter of years. In Dr. Evans' opinion, Wilson was not competent to make financial decisions for herself in May 2004.

The trial court found defendant guilty on all eight counts. In making her findings, the judge specifically noted that she found Arnetta Williams to be a credible witness and that she did not find David Service to be a credible witness. In addition, the trial court found that the power of attorney documents, even though their authenticity was questionable, created a legal and fiduciary relationship between defendant and Wilson. The trial court also found that the manner in which defendant acquired power of attorney, as well as the fact that defendant had Wilson's retirement benefit checks sent to defendant's address, satisfied the element of deception. Furthermore, the trial court found that Wilson did not consent, indeed, Wilson was not able to consent, to defendant's actions with respect to Wilson's money.

After hearing aggravation and mitigation, the trial court sentenced defendant to 13 years' incarceration in the Illinois Department of Corrections for counts I through VII and 7 years' incarceration in the Illinois Department of Corrections for count VIII, with both sentences to be served concurrently. Defendant moved to reconsider the sentence and the court reduced defendant's sentence on counts I through VII to 11 years' incarceration. At this time, the court also vacated defendant's convictions for counts VII and VIII under the one-act, one-crime doctrine.

Defendant then filed this timely appeal.

13

ANALYSIS

Defendant raises six issues on appeal: (1) whether the trial court erroneously sustained certain hearsay objections during the testimony of David Service and whether those rulings resulted in a violation of defendant's constitutional right to present a defense; (2) whether the trial court denied defendant a fair trial by mischaracterizing significant portions of the evidence presented at trial; (3) whether the State proved beyond a reasonable doubt that Mary Ann Wilson was unable to consent to defendant's use of her money, or that defendant had notice that her general power of attorney was terminated; (4) whether defendant's sentencing was improper because the trial court relied upon improper factors in aggravation; (5) whether defendant's sentences were excessive; and (6) whether this court should vacate five of defendant's six convictions under the one-act, one-crime rule.

## 1. Hearsay

Defendant first argues that the trial court erroneously sustained hearsay objections to testimony and that these rulings denied defendant her constitutional right to present evidence in her defense. We do not find this argument persuasive.

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *People v. Banks*, 237 Ill. 2d 154, 180 (2010). Conversely, an out-of-court statement offered for a purpose other than to prove the truth of the matter asserted is not hearsay. *Banks*, 237 Ill. 2d at 180. Hearsay statements are inadmissible unless an exception to the hearsay rule applies. *People v. Hammonds*, 399 Ill. App. 3d 927, 941 (2010).

14

No. 1-09-1020

Defendant argues that we should review this issue under a *de novo* standard because, she alleges, the trial court's rulings on the hearsay objections were based on a misapprehension of hearsay law. As will be discussed below, defendant's argument is not persuasive. Accordingly, we review a trial court's hearsay ruling for abuse of discretion. *Hammonds*, 399 Ill. App. 3 at 941-42.

Defendant objects to the trial court's exclusion of three statements made by David Service during his testimony and we consider each statement in turn. The first exclusion arose in the course of David's testimony about how he came to acquire a new vehicle:

"Q [Defense counsel]. Do you know how money was transacted for you to pay for the car?

A. Yes. My father and my mother, Mary Ann --

THE STATE: Objection

THE COURT: Objection is overruled. He can answer.

* * *

THE COURT: You may finish your answer.

A. They told me to go find another car.

THE STATE: Objection as to what they said.

THE COURT: You have to say who, specifically said what, sir if that's what you wish to do.

A. Mary Ann said that boy you'd better get a car because

15

you're going to freeze to death out there in that car.

THE STATE: Objection, calls for inadmissible hearsay being

matter [*sic*] to the truth of the matter asserted.

DEFENSE COUNSEL: Judge, actually it goes to the state of

mind of the witness at this point as to what he understood the

intent to be.

THE STATE: Judge, the question was how it was transacted,

where did the money, not what someone's intent was, not state of

mind. It was how it was transacted.

THE COURT: Sustained."

Defendant argues that David's statement "Mary Ann said that boy you'd better get a car because you're going to freeze to death out in that car," was not hearsay because it was not offered to prove the truth of the matter asserted. Instead, defendant contends that the statement is admissible to show the effect it had on the listener. A statement offered not for its truth but to show the effect on the listener's state of mind, or to show why the listener subsequently acted the way that he or she did, is not hearsay and can be admissible. *Hammonds*, 399 Ill. App. 3d at 943. Defendant argues that Mary Ann Wilson's purported statement to David Service is admissible because it shows why *defendant* obtained cashier's checks from Wilson's bank account payable to David for the purchase of a new vehicle. However, nothing in David's testimony indicates that defendant actually heard this statement. Since the statement cannot be used to show its

16

effect on defendant, it is inadmissible hearsay.

Defendant also argues that the statement is not hearsay because it has independent legal significance as authorization by Wilson to defendant's use of her money. As support, defendant cites *Kukla Press, Inc. v. Family Media, Inc.*, 133 Ill. App. 3d 939, 943 (1985). In *Kukla*, an affidavit of Richard Hilke referred to statements made by defendant Family Media to Peter Hughes and Bridget Spiess about certain contract obligations. *Kukla*, 133 Ill. App. 3d at 942. This court in *Kukla* stated that although the statements were hearsay as to Hilke, they were not hearsay as to Family Media and Hughes and Spiess because the statements had independent legal significance "as words of contract". *Kukla*, 133 Ill. App. 3d at 943. In the case at bar, there is no indication that the statement purportedly made by Wilson to David Service were "words of contract" authorizing defendant to withdraw money from Wilson's bank account to pay for David Service's new vehicle. At best, it is an admonition from Wilson to David that his current vehicle is inadequate and he should purchase a new one. Accordingly, the trial court did not abuse its discretion in finding the statement inadmissible hearsay.

The second statement at issue arose as follows:

> "Q. Did you indicate to your folks, meaning your dad and your
>
> stepmother, that you couldn't afford to pay the taxes?
>
> A. Yes. I told them I was behind and I told them I would pay it
>
> later and they said no take care of it now. Mary Ann said you know
>
> things happen go on and do it."

17

No. 1-09-1020

Defendant reiterates her earlier arguments with respect to this statement. Specifically, defendant argues that the statement is admissible because it either shows the effect on the listener or has independent legal significance. Defendant's argument is unpersuasive. First, although defendant asserts that the statement is admissible to show the effect on her, namely, to explain why she paid David's property taxes with Wilson's money, nothing in the record establishes that defendant heard Wilson make the statement. Thus, defendant cannot be a listener upon whom the statement had an effect. Second, we find no independent legal significance in Wilson's purported statement. Taking the statement at face value, Wilson told David not to put off paying his property taxes. This statement in no way authorizes defendant to use Wilson's money to pay David's property taxes. Accordingly, the trial court did not abuse its discretion in refusing to admit this second statement.

Finally, defendant argues that the trial court's exclusion of a third statement offered by David Service during his testimony was improper. In response to questioning about Clifford Service and Mary Ann Wilson's purported plans to move in with David Service and defendant, David testified as follows:

"Q. What was your understanding about when they were going to move to your house?

A. Well, they had been staying there off and on all the long [*sic*] and they were supposed to move in on a permanent basis.

The room that they were staying in wasn't really quite big

18

> enough for them to really live because they still wanted their space
> also. They said they wouldn't mind transforming the garage to a
> living space."

The trial court sustained the State's objection to David's last sentence ("They said ***."). On appeal, defendant reiterates the same two arguments that she presented for the first two statements and we find those arguments unpersuasive with respect to this third statement. As with the two statements discussed above, nothing in the record indicates that defendant heard this third statement. Thus, the "effect on the listener" exception cannot apply. In addition, nothing in the statement can be interpreted as authorizing defendant to use Wilson's money to pay for renovations. The purported statement merely suggests that Clifford and Wilson would not mind living in the garage if it were renovated into living space. Accordingly, the trial court did not abuse its discretion in excluding this third statement.

Defendant contends that the trial court denied her constitutional right to present evidence in her defense when it sustained objections to these three statements. We are not persuaded by this argument. While the trial court did not allow David Service to testify to specific statements made by Mary Ann Wilson, purportedly authorizing various uses of her money, the court did allow David to testify about what he understood Wilson's intent to be. The trial court's orders sustaining the State's objections to the hearsay testimony in no way prevented defendant from presenting her defense, namely, that Mary Ann Wilson authorized defendant's various expenditures of Wilson's money.

19

## 2. Mischaracterization of Evidence

Defendant next argues that the trial court denied defendant a fair trial by mischaracterizing significant portions of trial evidence in finding that (1) Mary Ann Wilson was unable to consent to financial transactions and (2) David Service was not a credible witness. Defendant did not object to these findings below and now asks us to consider her argument under the plain error doctrine. Citing *People v. Ramos*, 396 Ill. App. 3d 869 (2009), and *People v. Stroud*, 392 Ill. App. 3d 776 (2009), defendant claims that this issue is subject to *de novo* review because, according to her, it does not involve fact finding or credibility assessments. Generally, courts of review accord great deference to a trial court's findings of fact and we will only reverse if those findings are against the manifest weight of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). Similarly, the trier of fact is the sole arbiter of the credibility of witnesses and it is not the function of the appellate court to substitute its judgment for that of the trier of fact. *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010).

However, before determining the appropriate standard of review, we first consider whether we may even address this issue on appeal. Defendant never objected to the trial court's findings, nor did she raise the issue in her posttrial motion. It is well established that a party must object below and raise the issue in a posttrial motion in order to preserve the issue for appeal. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Defendant concedes that she has forfeited this issue. However, she argues that we should nevertheless consider her arguments because the doctrine of forfeiture "is not rigidly

No. 1-09-1020

applied where the basis for the objection is the conduct of the trial judge." *People v. Sims*, 192

Ill. 2d 592, 636 (2000).

*Sims* cites to *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963), in which our supreme

court relaxed the forfeiture rule in those cases where the trial judge oversteps his or her authority

in front of a jury. Because the court's reasoning in *Sprinkle* focused on ensuring a fair trial, our

supreme court has occasionally applied *Sprinkle* and relaxed the forfeiture rule in cases where no

jury was present. *McLaurin*, 235 Ill. 2d at 487 (citing cases). However, our supreme court has

been reluctant to extend the *Sprinkle* doctrine beyond a narrow set of extraordinary

circumstances. The court recently explained:

> "We stress, however, that trial counsel has an obligation to raise
>
> contemporaneous objections and to properly preserve those
>
> objections for review. Failure to raise claims of error before the
>
> trial court denies the court the opportunity to correct the error
>
> immediately and grant a new trial if one is warranted, wasting time
>
> and judicial resources. [Citation.] This failure can be excused only
>
> under extraordinary circumstances, such as when a trial judge
>
> makes inappropriate remarks to a jury [citation] or relies on social
>
> commentary, rather than evidence, in sentencing a defendant to
>
> death [citation]. That we have seldom applied *Sprinkle* to
>
> noncapital cases further underscores the importance of uniform

21

application of the forfeiture rule except in the most compelling of situations." *McLaurin*, 235 Ill. 2d at 488.

Defendant argues that the error she raises here is attributable to the trial judge's conduct. But there was no jury present and defendant makes no argument that her counsel was practically prevented from objecting to the trial judge's findings. The record indicates that counsel was present during the entire trial proceeding and that counsel made numerous objections during the course of the trial. Indeed, the record suggests no basis on which we could conclude that counsel's objection would have " 'fallen on deaf ears.' " *Id.* Counsel here had every opportunity to raise an objection before the trial court. Because defendant has not presented any "extraordinary or compelling reason to relax the forfeiture rule in this case," we decline to do so here. *Id.* at 489.

Defendant argues, in the alternative, that we should consider this issue as plain error under Rule 615(a). Supreme Court Rule 615(a) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d S. Ct. R. 615(a). The plain error doctrine allows a reviewing court to consider a small class of forfeited errors. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). It is not a " 'general saving clause' " but is instead a narrow and limited exception to the waiver rule. *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Plain error occurs where a clear or obvious error occurred and either (1) the evidence is so closely balanced that the

22

case should be reversed regardless of the seriousness of the error, or (2) the error is of such magnitude as to affect the fairness of the defendant's trial and challenge the integrity of the judicial process, regardless of the weight of the evidence against defendant. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007) (citing *Herron*, 215 Ill. 2d at 186-87; see also *People v. Hillier*, 237 Ill. 2d 539, 545 (2010)).

Before we can apply the plain error rule, we must first determine whether any error occurred below. *McLaurin*, 235 Ill. 2d at 489. Our review of the record indicates that no such error occurred in the instant case. Doctors Gaziano and Evans both testified that Mary Ann Wilson suffered from dementia in 2004 and that patients who suffered that sort of dementia are unable to manage their own financial affairs. Even though the trial court struck Dr. Gaziano's testimony on direct examination that, in his expert opinion, Wilson suffered from dementia in 2004, the witness later testified during both direct and cross-examination about medical records that indicated a diagnosis of dementia at that time. This testimony alone was sufficient to support the trial court's finding that Wilson suffered from dementia, despite the testimony of David Service to the contrary. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("a reviewing court will not reverse a conviction simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible").

Furthermore, we do not find that the trial court erred in finding the testimony of David Service not credible. In her brief, defendant points to multiple occasions in the trial court's lengthy oral findings of fact in which the court made minor errors or slips of the tongue (*e.g.*,

23

saying "Home Depot" instead of "Menards"). However, the trial court also noted several aspects of David's testimony that it found completely incredulous. For instance, David testified that Mary Ann Wilson, an octogenarian who had undergone a double hip replacement, rode a horse nearly every day. David also testified that Wilson conversed with him on a daily basis during 2005 and 2006, testimony that was contradicted by the testimony of the State's expert witnesses. Our review of the record provided no basis on which to find that the trial court erred in making its credibility determination. Because we find no error below, there is no need to consider defendant's arguments under the plain error rule.

### 3. Sufficiency of the Evidence

Defendant also argues on appeal that the State failed to prove beyond a reasonable doubt that (1) Wilson's dementia rendered her incompetent to authorize defendant's financial transactions or (2) defendant had notice that her power of attorney was terminated due to Wilson's dementia. When presented with a challenge to the sufficiency of the evidence, a reviewing court should not retry a defendant. *People v. McDonald*, 168 Ill. 2d 420, 443 (1995). Instead, "the relevant inquiry on review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in the original.) *McDonald*, 168 Ill. 2d at 443-44 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not reverse a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the guilt of the defendant." *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000).

No. 1-09-1020

The Criminal Code of 1961 defines the crime of financial exploitation of an elderly person as follows:

> "A person commits the offense of financial exploitation of an elderly person or a person with a disability when he or she stands in a position of trust or confidence with the elderly person or a person with a disability and he or she knowingly and by deception or intimidation obtains control over the property of an elderly person or a person with a disability or illegally uses the assets or resources of an elderly person or a person with a disability. The illegal use of the assets or resources of an elderly person or a person with a disability includes, but is not limited to, the misappropriation of those assets or resources by undue influence, breach of a fiduciary relationship, fraud, deception, extortion, or use of the assets or resources contrary to law." 720 ILCS 5/16-1.3(a) (West 2008).

In order to sustain a conviction for theft under section 16-1(a)(1) (720 ILCS 5/16-1(a)(1) (West 2008)), the State must establish that "(1) the defendant obtained or exerted control over another's property, and (2) the control was unauthorized." *People v. Graves*, 207 Ill. 2d 478, 483-84 (2003).

Defendant first argues that the State failed to prove beyond a reasonable doubt that

25

No. 1-09-1020

Wilson's dementia left her incompetent to authorize financial transactions. We are not persuaded by this argument. The expert testimony presented at trial established that Wilson suffered from dementia in May 2004, and that her dementia continued and progressed through 2006. Both medical experts testified that persons suffering from this sort of dementia were unable to handle their own financial affairs. Thus, the record establishes that the trial court did not err in finding beyond a reasonable doubt that Wilson's dementia precluded her from authorizing defendant's use of Wilson's funds. *Schmalz*, 194 Ill. 2d at 80. And defendant has presented no argument showing that the "evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the guilt of the defendant." *Id.*

In addition, defendant argues that the State failed to prove beyond a reasonable doubt that defendant had notice that her general power of attorney was terminated. We find this argument, too, unpersuasive. On appeal, defendant does not allege that her durable power of attorney was proper and valid. Instead, she relies on the earlier general power of attorney purportedly signed by Wilson on January 15, 2004. With this argument, and the one discussed above, defendant only challenges the element of authorization in each of the two crimes charged. In other words, defendant concedes that the State proved all of the other elements and only argues that her actions were in fact authorized by the general power of attorney.

In the instant case, the trial court specifically found that Mary Ann Wilson suffered from dementia and was unable to maintain control over her own finances beginning as late as May 2004, nearly one year before the transactions at issue in this case took place. The testimony of

26

the two medical experts and that of Arnetta Williams also established that Wilson had difficulty communicating during this period. Thus, the evidence in the record supports the inference that, at the very least, defendant should have known that Wilson was unable to consent to defendant's various financial transactions involving Wilson's funds. As noted above, it is not the function of this court to retry the defendant. *People v. McDonald*, 168 Ill. 2d at 443. The record supports the trial court's finding that Wilson did not authorize Bailey to deplete her life savings.

### 4. Improper Sentences

Defendant argues that the trial court's sentencing was improper because the trial court assumed (1) that defendant retained a large amount of Wilson's money and (2) defendant did not act in Wilson's best medical interests.

First, we must determine the appropriate standard of review. Defendant argues that whether the trial court considered improper factors in determining defendant's sentence and how much weight the trial court placed on those factors are both questions of law that we should review *de novo*. Defendant cites *People v. Caballes*, 221 Ill. 2d 282, 289 (2006), in support of her contention. However, *Caballes* involved questions of probable cause in the context of the search and seizure provision of article I, section 6, of the Illinois Constitution of 1970 and thus is entirely inapplicable here. Furthermore, defendant makes no other argument to show why we should not apply the general rule that appellate courts review a trial court's sentencing of a defendant for abuse of discretion. *People v. Johnson*, 347 Ill. App. 3d 570, 573-74 (2004); *People v. Robinson*, 299 Ill. App. 3d 426, 444 (1998).

27

We apply an abuse of discretion standard here. *Johnson*, 347 Ill. App. 3d at 573-74. We do so because "the trial judge is in the best position to determine the circumstances of the case, to weigh the credibility of the witnesses, and to evaluate the record made at the hearing in aggravation and mitigation." *Robinson,* 299 Ill. App. 3d at 444. Thus, we will only reverse the trial court's determination where that ruling is "arbitrary, fanciful, unreasonable or where no reasonable person would take the view adopted by the trial court." *Johnson*, 347 Ill. App. 3d at 574 (citing *People v. Hall*, 195 Ill. 2d 1, 20 (2000)). In particular, we will not disturb sentences that fall within the statutory guidelines unless they are "greatly disproportionate" to the nature of the offenses of which the defendant has been convicted. *Johnson*, 347 Ill. App. 3d at 574.

We note initially that defendant's sentence, 11 years' incarceration in the Illinois Department of Corrections, falls within the statutory guidelines. Financial exploitation of an elderly person is a Class 1 felony where, as here, the value of the property is $100,000 or more or if the elderly victim is over 80 years of age and the value of the property is at least $5,000. 720 ILCS 5/16-1.3 (West 2008). Theft is also a Class 1 felony where, as here, the value of the property exceeds $100,000. 720 ILCS 5/16-1(b)(6) (West 2008). Accordingly, the sentencing range to which defendant was subject is not less than 4 years' and not more than 15 years' imprisonment. 730 ILCS 5/5-4.5-30 (West 2008).

The Unified Code of Corrections provides a list of 26 factors that "shall be accorded weight in favor of imposing a term of imprisonment." 730 ILCS 5/5-5-3.2(a) (West 2008). One such aggravating factor is where "the defendant committed the offense against a person 60 years

28

of age or older or such person's property." 730 ILCS 5/5-5-3.2(a)(8) (West 2008). However, the list of factors provided in section 5-5-3.2 is not exclusive. As this court has previously found, "In order to reach a reasoned determination as to the proper sentence to impose, the circuit court must look to the particular circumstances of each case and take into consideration the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Robinson*, 299 Ill. App. 3d at 444 (citing *People v. Heredia*, 193 Ill. App. 3d 1073, 1083 (1989)).

Defendant argues on appeal that the trial court improperly considered two factors in sentencing defendant: (1) the great amount of money awaiting defendant upon her release and (2) the fact that defendant did not act in Mary Ann Wilson's best medical interests. We note that defendant admits that she did not raise this issue in her motion to reconsider her sentence and asks us to consider the issue under plain error.[1] First, we must determine whether error even occurred below. *McLaurin*, 235 Ill. 2d at 489.

In her briefs, defendant cites to no authority showing how either of the two factors listed above was improper for the trial court to consider. Indeed, she could not for the factors appear to fall under the permissible categories of "social environment" and "general moral character,"

---

[1]Defendant argues in her brief that "forfeiture should not apply as defense counsel was not expected to interrupt the judge and point out that she was considering incorrect factors." A motion to reconsider a sentence does not "interrupt the judge." Instead, it is the proper means of bringing potential errors at sentencing to the attention of the trial court so that the court may remedy the error. We also note that defendant raised other challenges to her sentence in her motion to reconsider her sentence and that the trial court reduced defendant's sentence after considering her argument.

respectively. *Robinson*, 299 Ill. App. 3d at 444. Instead, defendant challenges the sufficiency of the evidence presented during the sentencing hearing. She argues that while these facts, if true, would be permissible factors for a court to consider in sentencing, the trial court's conclusions here were unsupported by the evidence.

The State is not subject to the same burden of proof at a sentencing hearing as it is during the guilt phase of a trial. Indeed, our supreme court has not articulated a specific burden of proof at sentencing and instead maintains that "relevance and reliability are the important factors in the consideration of evidence at sentencing." *People v. Jackson*, 149 Ill. 2d 540, 549 (1992).

Our review of the record indicates that the trial court had a more than sufficient basis for finding that defendant would have a "great amount of money out there" awaiting her release. The evidence in the record establishes that defendant made several large cash withdrawals, including one of approximately $85,000, from which the funds have never been accounted. Thus it was logical for the trial court to infer that defendant still had access to the monies that she had not yet spent at the time of trial.

In addition, the evidence in the record establishes that defendant did not act in Mary Ann Wilson's best medical interests when defendant refused medical treatment for Wilson when Arnetta Williams telephoned for paramedics and when hospital workers were directed not to prescribe for Wilson any medication stronger than Tylenol after her hip replacement surgery. Williams testified that she was concerned enough about Wilson's medical condition that she telephoned for help and that defendant instructed the paramedics not to take Wilson to the

hospital for further diagnosis and treatment. Defendant argues in her brief that there was insufficient information presented at the sentencing hearing for the trial court to conclude that defendant's direction to the paramedics not to take Wilson to the hospital was against Wilson's best medical interests. We are not persuaded by this argument because the trial court was able to assess Williams' credibility on the stand and assess the relevance and reliability of Williams' testimony in light of her earlier testimony about Wilson's physical condition. The record also establishes that defendant had power of attorney for health care for Wilson at the time of her hip replacement surgery and thus had control over the decision to give her only Tylenol, as opposed to stronger pain medications.

The evidence in the record establishes that any weight which the trial court placed upon these two factors was not arbitrary, fanciful, or unreasonable because the evidence presented sufficiently established each factor for consideration at sentencing. Accordingly, we do not find that a clear or obvious error occurred and thus we decline to consider defendant's argument under plain error. *McLaurin*, 235 Ill. 2d at 489.

### 5. Excessive Sentences

Defendant further argues that her sentences are excessive and should be reduced. Specifically, defendant argues that significant mitigating factors -- the fact that defendant had no prior criminal convictions, the fact that defendant's conduct arose out of circumstances unlikely to recur, the fact that defendant is unlikely to commit future offenses, and defendant's strong potential for rehabilitation -- all call for a lesser sentence.

31

No. 1-09-1020

As noted above, we review a trial court's sentencing of a criminal defendant for abuse of discretion. *Johnson*, 347 Ill. App. 3d at 573-74. And as discussed above, defendant's 11-year sentences do not exceed the statutory maximum for Class 1 felonies. 720 ILCS 5/5-4.5-30 (West 2008). Defendant points to several mitigating factors that she argues should have resulted in a lesser sentence. First, defendant highlights her lack of criminal history. See 730 ILCS 5/5-5-3.1(a)(7) (West 2008). Second, defendant argues that the circumstances of the offenses were unusual and unlikely to recur because the offenses arose out of her use of a power of attorney given to her. See 730 ILCS 5/5-5-3.1(a)(8) (West 2008). Third, defendant points to her strong potential for rehabilitation because of her high level of education, her history of steady employment, and her strong family ties. Finally, defendant argues that the State never proved that her conduct had been selfishly motivated and without regard for Mary Ann Wilson's interests.

We are not persuaded by this final argument. Defendant stole over $300,000 from Mary Ann Wilson: nearly all of the victim's life savings. Evidence presented at trial established that defendant spent these funds on, among other things, a new car for her husband, private school tuition for her children, cell phone bills for her children, and furniture from Pottery Barn. Furthermore, the evidence presented at trial also established that by May 2006, Wilson was living in squalor and her clothing, shoes, and other personal possessions were no longer in her house.

A trial court is presumed to have considered all of the relevant evidence of mitigation

before it. *Robinson*, 299 Ill. App. 3d at 445. Defendant has not shown that the trial court did not consider the evidence of mitigation discussed above. Indeed, defendant was eligible for, and the State sought, an enhanced sentence and the trial court nevertheless imposed a sentence less than the statutory maximum, ignoring the additional range available under a sentencing enhancement. Accordingly, we do not find that the trial court abused its discretion in sentencing defendant to 11 years' incarceration in the Illinois Department of Corrections.

### 6. One Act, One Crime

Finally, defendant argues that five of her six convictions should be vacated pursuant to the one-act, one-crime doctrine. Defendant admits that she has forfeited this issue, but we may nevertheless consider it because "forfeited one-act, one-crime arguments are properly reviewed under the second prong of the plain-error rule." *People v. Nunez*, 236 Ill. 2d 488, 493 (2010). Whether defendant's multiple convictions violated the one-act, one-crime doctrine is a question of law, which we review *de novo. Nunez*, 236 Ill. 2d at 493.

Our supreme court laid out the foundations of one-act, one-crime in *People v. King*:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases

where a defendant has committed several acts, despite the

interrelationship of those acts. 'Act,' when used in this sense, is

intended to mean any overt or outward manifestation which will

support a different offense. We hold, therefore, that when more

than one offense arises from a series of incidental or closely

related acts and the offenses are not, by definition, lesser included

offenses, convictions with concurrent sentences can be entered."

*People v. King*, 66 Ill. 2d 551, 566 (1977).

Thus, the first step in the analysis is to determine whether defendant committed one act or multiple acts. *Nunez*, 236 Ill. 2d at 494. "Multiple convictions are improper if they are based on precisely the same physical act." *Id.* But if defendant committed multiple acts, we must next determine whether any of the offenses of which defendant has been convicted are lesser-included offenses. *Id.* The Illinois Criminal Code defines an included offense as one established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2008). And "if a defendant is convicted of two offenses based upon the same single physical act, the conviction for the less serious offense must be vacated." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

Where a defendant has committed multiple acts, each capable of sustaining a separate conviction, the State can charge defendant either for each separate act or for the cumulative

effect of the acts under multiple theories of the offense. But in order to sustain multiple convictions -- one for each separate act -- in such an instance, the State must provide notice to the defendant in the form of an indictment indicating that the State intends to treat the conduct of the defendant as multiple acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001). In *Crespo*, the defendant was convicted of the first degree murder of one victim and one count each of armed violence and aggravated battery in the stabbing of a second victim. 203 Ill. 2d at 337. On appeal to the supreme court, the defendant argued that his conviction for aggravated battery should be vacated because it stemmed from the same physical act as the armed violence charge. *Id.* Although the defendant had stabbed the second victim three times, and each stabbing was a separate and distinct act, the State did not charge defendant for the three separate stabbings in the indictment. *Id.* at 340-42. Instead, the different counts in the indictment charged the defendant under different theories of criminal culpability for the same course of conduct, namely, the three stabbings. *Id.* at 342. Our supreme court held that where a defendant commits multiple criminal acts but the indictment only charges the defendant for a single course of conduct, even if multiple theories of culpability are presented, the trial court cannot then convict the defendant for separate criminal acts. *Id.* at 345.

In the instant case, defendant argues that we should vacate all but one of her convictions: either count three or count four of the indictment. The State agrees that some of defendant's convictions should merge but argues that defendant's convictions on counts one and two should remain on the mittimus. As noted above, the trial court convicted defendant of the following six

35

counts:

(1) Financial exploitation of an elderly person in that she, while standing in a position of trust or confidence with Mary Ann Wilson, an elderly person, knowingly and by deception obtained control over property, to wit: United States currency, of a value of $100,000 or more;

(2) Financial exploitation of an elderly person in that she, while standing in a position of trust or confidence with Mary Ann Wilson, an elderly person, knowingly and illegally used the assets or resources of Mary Ann Wilson, to wit: United States currency, of a value of $100,000 or more;

(3) Financial exploitation of an elderly person in that she, while standing in a position of trust or confidence with Mary Ann Wilson, an elderly person, knowingly and by deception obtained control over property, to wit: United States currency, of a value of $5,000 or more and Mary Ann Wilson was over 80 years of age;

(4) Financial exploitation of an elderly person in that she, while standing in a position of trust or confidence with Mary Ann Wilson, an elderly person, knowingly and illegally used the assets or resources of Mary Ann Wilson, to wit: United States currency, of a value of $5,000 or more and Mary Ann Wilson was over 80 years of age;

(5) Theft in that she, in furtherance of a single intention and design knowingly obtained or exerted unauthorized control over United States currency of a value in

excess of $100,000, the property of Mary Ann Wilson, intending to deprive said Mary Ann Wilson permanently of the use or benefit of said property; and

(6) Theft in that she, in furtherance of a single intention and design knowingly obtained or exerted unauthorized control over United States Currency of a value in excess of $100,000, the property of Mary Ann Wilson, intending to deprive said Mary Ann Wilson permanently of the use or benefit of said property, and the State shall seek an extended-term sentence in that the offense was committed against a person who was 60 years of age or older at the time of the offense.

Both parties rightly agree that the theft offenses should be vacated, and we order the mittimus to be so corrected. However, as noted above, the parties do not agree on which counts of financial exploitation of an elderly person should be merged. Unlike in *Crespo*, where the indictment did not differentiate between multiple occurrences of the same act, namely, stabbing, here the indictment did differentiate between multiple different acts. Counts I and III alleged that defendant knowingly and by deception or intimidation obtained control over Mary Ann Wilson's property. From our review of the record, we understand these counts to refer to defendant's actions in obtaining a durable power of attorney from the victim. Counts II and IV alleged that defendant illegally used the assets or resources of Mary Ann Wilson. From our review of the record, we understand these counts to refer to defendant's actions in the unauthorized taking of over $300,000 of Mary Ann Wilson's savings. Thus, counts I and III and II and IV refer to separate acts and do not run afoul of

37

one-act, one-crime problems.

The question then becomes whether counts I and III and II and IV should merge. Counts I and III appear to arise from the same physical act: obtaining the durable power of attorney. Thus, the less serious offense must be vacated. *Johnson*, 237 Ill. 2d at 97. But which offense is less serious? "It is the province of the legislature to determine the seriousness of an offense." *Id.* And our supreme court has previously held that "common sense indicates that the legislature will provide a greater punishment for the crime it deems to be more serious." *Id.* Yet here both crimes carry the same penalty -- they are both Class 1 felonies. 720 ILCS 5/16-1.3(a) (West 2008). Because count I requires the State to prove that defendant obtained control over at least $100,000 while count III requires proof of a much lesser amount, $5,000, we believe that count I is the more serious offense. Accordingly, defendant's conviction under count III should be vacated.

Under the same reasoning, defendant's conviction under count IV should merge with her conviction under count II. Although defendant took over $300,000 from Mary Ann Wilson through multiple acts taking place over a period of several months, the indictment does not make clear that the State would seek to convict defendant separately for each and every act where money was taken (*e.g.*, the $85,000 cash withdrawal, the payment of David Service's property taxes, the payments for renovations on defendant's house, and the purchase of a new vehicle for David Service, to name a few) as opposed to a cumulative conviction for defendant's course of conduct in her dealings with Mary Ann Wilson. Accordingly,

defendant's conviction under count four should be vacated.

In sum, defendant's convictions under counts I and II remain and her convictions under counts III through VI will be vacated.

CONCLUSION

For the foregoing reasons, while the decision of the circuit court of Cook County is affirmed, counts III through VI of defendant's convictions are vacated, and the sentence shall remain unchanged.

Affirmed; mittimus corrected.

No. 1-09-1020

THE PEOPLE OF THE STATE OF ILLINOIS,

      Plaintiff-Appellee,

    v.

KAREN BAILEY,

      Defendant-Appellant.

No. 1-09-1020

Appellate Court of Illinois
First District, Second Division

April 26, 2011

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Karnezis concurred in the judgment
   and opinion.

Appeal from the Circuit Court of Cook County.

The Honorable Angela Munari Petrone, Judge Presiding.

Michael J. Pelletier, State Appellate Defender, Office of the State Appellate Defender, 203 North LaSalle Street, 24th Floor, Chicago, IL 60601, (Patricia Unsinn and Adrienne River, of counsel) for APPELLANT.

Anita Alvarez, State's Attorney, County of Cook, Room 309, Richard Daley Center, Chicago, IL 60602, (Alan J. Spellberg, Douglas P. Harvath and Sheilah C. O'Grady, of counsel), for APPELLEE.