NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180756-U

NO. 4-18-0756

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 7, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| LEON S. ROBINSON, | ) | No. 17CF1701 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Defendant was proven guilty beyond a reasonable doubt of both domestic battery and aggravated battery.

(2) Evidence presented at defendant's sentencing supported the felony enhancement of his DWLR offense.

(3) Defendant failed to establish that alleged improper remarks by the prosecutor during her closing argument constituted either reversible error or plain error.

(4) The trial court properly admonished and questioned potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

(5) The trial court conducted an adequate *Krankel* inquiry into defendant's *pro se* posttrial ineffective-assistance-of-counsel claims.

(6) Defendant's convictions for both domestic battery and aggravated battery violate the one-act, one-crime rule and remand to the trial court is necessary so that it may determine which offense is less serious and vacate that offense.

¶ 2        Following a jury trial, defendant, Leon S. Robinson, was found guilty of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)), aggravated battery (*id.* § 12-3.05(c)), and driving while his license was revoked (DWLR) (625 ILCS 5/6-303(a) (West 2016)). The trial court sentenced him to concurrent terms of five years in prison for each battery-related offense and one year in prison for DWLR. Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt of both domestic battery and aggravated battery; (2) his DWLR conviction should be reduced from a felony to a misdemeanor because the State failed to present any evidence supporting the felony enhancement of that offense; (3) he was denied a fair trial due to comments the prosecutor made during closing argument; (4) the court failed to properly admonish and question potential jurors pursuant to Illinois Supreme court Rule 431(b) (eff. July 1, 2012); (5) the court did not conduct a proper *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)) into his *pro se* posttrial ineffective-assistance-of-counsel claims; and (6) his aggravated battery conviction must be vacated pursuant to the one-act, one-crime rule. We agree that defendant's two battery-related convictions violate the one-act, one-crime rule but remand to the trial court with directions that it determine which is the less serious of the two offenses and vacate that offense. We otherwise affirm the court's judgment.

¶ 3                              I. BACKGROUND

¶ 4        In December 2017, the State charged defendant with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)), aggravated battery (*id.* § 12-3.05(c)), and DWLR (625 ILCS 5/6-303(a) (West 2016)). It alleged that, on August 4, 2017, defendant, who had three prior domestic battery convictions, punched Tiffany Smith, with whom he had a dating relationship, in the head while "on or about *** a public way," causing Smith bodily harm. The State also asserted

- 2 -

defendant drove a motor vehicle on that day, while his driver's license was revoked for having committed a driving under the influence (DUI) offense (*id.* § 11-501) and when he had previously committed the offense of driving with a suspended or revoked license (*id.* § 6-303(a)).

¶ 5        In July 2018, defendant's jury trial was conducted. During *voir dire*, the trial court questioned potential jurors in panels of four regarding the basic principles law that apply to criminal proceedings. It utilized substantially the same procedure with each panel, initially reciting the principles as follows:

> "[T]he defendant is presumed to be innocent of the charges against him; that before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt; that the defendant is not required to offer any evidence on his behalf[;] and that if the defendant does not testify, that fact can not be held against him in any way."

Immediately after its recitation of the principles, the court asked each panel whether they "underst[ood] those instructions." Every juror answered affirmatively. The court then questioned whether the jurors would "accept those instructions." Again, every juror confirmed his or her acceptance of the principles recited by the court.

¶ 6        At trial, the State presented evidence regarding an incident involving defendant and Smith on the evening of August 4, 2017, near the intersection of Windsor Road and Bel Air Court in Champaign, Illinois. At 7:16 p.m. that day, Smith telephoned 911 and requested assistance. A recording of the 911 call was admitted into evidence and played for the jury. During the call, Smith reported she recently got off work and defendant, whom she identified by name and described as her ex-boyfriend, picked her up in her car, a blue Chevy Impala. She stated defendant was "drunk"

and she exited the car because he started arguing with her and was threatening to hit her. Smith identified her location as "on Windsor" by the "Masonic Lodge" and provided a description of both defendant and her vehicle. Shortly thereafter, she reported that defendant was "driving back" and asked the 911 dispatcher to "please hurry up and send somebody" because defendant was "gonna go crazy." On the recording, amidst background noises, Smith can be heard repeatedly saying "get away from me" and then the word "stop," while another voice asked, "did you call the police on me."

¶ 7        The State presented four eyewitnesses who reported observing an incident between a man and a woman while driving on Windsor Road on the evening of August 4, 2017. Three of those witnesses—Dennis Johnson and Arie and Shannon Zoller, a married couple—testified they saw the man hit the woman. Johnson testified that, as he was driving, he saw that the man "had his arm around [the woman's] neck and he was hitting her in the face." He estimated the man hit the woman more than five times. Johnson parked and exited his vehicle to confront the man. He tried to pull the man's arm away from the woman's neck and, ultimately, the man released her. The man then took "a swing at" Johnson. The woman told the man to leave Johnson alone, and then the man got into a vehicle and drove away from the scene.

¶ 8        Johnson identified defendant as the man he saw. He also identified a photograph of Smith as depicting the woman involved in the altercation. Johnson testified Smith appeared upset and was acting "[l]ike she had sustained a hit that would hurt her." Smith's neck also "looked a little red."

¶ 9        The Zollers testified that while driving on Windsor Road, they saw a man and woman struggling and the man strike or hit the woman multiple times. They parked their vehicle

- 4 -

and went to offer their assistance to the woman. Arie testified that by the time he reached the man and woman, another person appeared to have separated them. Both of the Zollers observed the man get into a car and drive away. Arie identified defendant as the man he observed. Both of the Zollers identified a photograph of Smith as depicting the woman involved in the incident. Arie testified Smith appeared distraught and disheveled, and he recalled seeing marks on her shoulder and neck. Shannon testified she spoke with Smith for a long time after the incident. She described Smith as emotional, distraught, and distressed. Shannon also observed that Smith was disheveled with marks on her neck and "back area."

¶ 10        As part of its case, the State also called Smith as a witness. Smith testified she worked as a certified nursing assistant (CNA) and was in a romantic relationship with defendant for 10 years, beginning in 2007. On August 4, 2017, the two were not "together"; however, Smith allowed defendant to use her car, a blue Chevy Impala, while she was at work. When she got done with work, defendant picked her up. As the two were driving on Windsor Road, they got into an argument, and defendant pulled over. Smith exited the vehicle and, after defendant drove away, she called 911. Smith testified she remained on the phone with the 911 dispatcher as defendant returned to the scene. According to Smith, upon his return, defendant exited her car and tried to talk to her. He also tried to get Smith to get back in her car, but she refused and walked away from him. Smith denied that defendant yelled at her or that the two were involved in any physical altercation. After she refused to get back into the car, defendant left the scene for a second time.

¶ 11        Smith acknowledged that other people arrived on the scene while defendant was still present. She also recalled speaking with a police officer who responded to her 911 call. Smith testified she told the officer she wanted to report that her vehicle was stolen but denied telling him

what the other people on the scene were doing to try to help her or that defendant tried "to swing" at one of those people. She also denied nodding in response to information provided by the other individuals who were present.

¶ 12    Smith identified photographs taken of her at the scene of the incident by the police. The photographs were admitted into evidence and showed marks on Smith's face, neck, and chest.

¶ 13    Smith agreed that there were "times in the past" when she and defendant were involved in "altercations" that had "gotten physical and [defendant] ha[d] hit [her]." She agreed that those physical altercations had happened more than once. Regarding an incident in February 2017, the following colloquy occurred between the State and Smith:

"Q. So did [defendant] get physical with you on February 1st of 2017?

A. There might've been a situation that happened.

Q. Did you have to go to the hospital for that?

* * *

A. Yes.

Q. What had [defendant] done to you to make you have to go to the hospital?

* * *

A. That has been well over a year ago, so therefore I don't remember everything that has happened.

Q. Did you talk to a police officer?

A. I probably did.

Q. Had [defendant] gotten mad at you, gotten enraged at you before you went to the hospital?

A. It could've happened. It could've—we could've got into an argument

again, and that might have been what happened."

Ultimately, Smith testified that she did not recall whether defendant punched her in the face during a February 2017 argument or made her promise to lie to hospital staff about why she was injured. She then stated she had gone to the hospital because she "was being clumsy and [she] fell" after tripping over her long pants. Smith acknowledged that she still loved defendant and did not want bad things to happen to him.

¶ 14        On cross-examination, Smith testified that on August 4, 2017, she was upset because she believed defendant was seeing other women. She stated she called the police because defendant "pulled off in [her] car." Again, Smith denied that defendant hit her or did anything "physical" to her on that day. She acknowledged that photographs taken by the police showed marks on her neck, chest, and face. However, she maintained the marks were not caused by defendant. Smith denied knowing where the marks came from but asserted her work as a CNA could be "very physical" and that some of the marks may have been the result of "dealing with a patient."

¶ 15        Brandon Thomas, a patrol sergeant with the Champaign Police Department, testified, on the evening of August 4, 2017, he responded to a call about a domestic incident near the intersection of Windsor Road and Bel Air Court in Champaign. As he arrived on the scene, he saw several people standing on the sidewalk area and a blue Chevy Impala leaving the area. The people at the scene began "vehemently pointing" to the Impala, and Thompson attempted to effect a traffic stop on the vehicle. He stated he followed the vehicle into a cul-de-sac and observed as it turned around and drove toward and then past him. Thomas testified he was able to view the driver of the vehicle and saw that he was wearing a blue ball cap. He identified defendant as the driver.

¶ 16        Thomas did not pursue defendant and, instead, returned to interview the people he observed on the sidewalk. Those individuals included Smith and several witnesses. According to Thomas, Smith appeared disheveled and was upset and crying. Additionally, her hair was "messy" and she had "a few marks," including marks on her face and chest "that seemed consistent with traumatic injury." Thomas recalled seeing a small mark above Smith's left eyebrow that was "consistent with an abrasion or a small scratch" and appeared "to have been either recently bleeding or about to bleed," as well as a mark below Smith's left eye.

¶ 17        Thomas testified that he spoke with Smith and the other individuals who were present in a group and asked whether Smith had been struck and punched in the face. As witnesses recounted what had occurred, Smith "confirmed" the witnesses' statements "in subtle ways" by "nodding her head yes." Thomas did not remember if Smith verbalized any agreement but asserted "she certainly didn't correct anyone's statement or challenge what they were telling [him]." He further testified that Smith never told him she had not been hit.

¶ 18        Portions of video and audio recordings from a body camera worn by Thomas during the incident were admitted into evidence and played for the jury. On the recordings, Smith reported to Thomas that defendant had taken a "swing" at a man who tried to help her. Additionally, witnesses described Smith as being struck by her assailant and trying to get away. Smith nodded her head up and down during the witnesses' statements and did not contradict their observations.

¶ 19        Finally, the State's evidence included an exhibit containing defendant's driving abstract from the Illinois Secretary of State's Office, showing that a revocation of his driver's license was in effect on August 4, 2017. At the conclusion of the State's case, defendant elected not to testify on his own behalf and presented no evidence or witness testimony.

¶ 20    During closing arguments, the prosecutor described the "cycle of abuse" that can occur in relationships and argued that in August 2017, Smith was in the middle of a "cycle of abuse" with defendant. Defendant raised no objection to the prosecutor's comments. However, he later objected to a statement by the prosecutor that, in February 2017, Smith "had to go to the hospital because of what [defendant] did to her," asserting the prosecution was arguing "facts not in evidence." The trial court overruled defendant's objection. Ultimately, the jury found defendant guilty of each charged offense.

¶ 21    In August 2018, defendant filed a posttrial motion for an acquittal or, alternatively, a new trial. He argued he was not proven guilty beyond a reasonable doubt and challenged the trial court's rulings on various motions or objections, including the objection he raised during the State's closing argument based on "the State assuming facts not in evidence."

¶ 22    On August 27, 2018, the trial court conducted a hearing in the matter. At the outset of the hearing, defendant's counsel, Amanda Riess, noted defendant had complaints about her representation that he wanted to bring to the court's attention. The court asked defendant "what is it you have to say," and defendant responded that he felt Riess "ha[d]n't represented [him]" and that he had alibi witnesses, whom Riess failed to investigate. The court responded that the evidence against defendant had been overwhelming such that the alleged error was not prejudicial and found Riess represented defendant to the best of her ability "given the circumstances of the case." Riess then stated for the record that she "was not informed of any alibi witnesses before the trial" and, instead, defendant "mentioned those to [her] after the trial." When defendant attempted to interject further comments, the court responded to him as follows:

"All right, I don't—I don't—that's it, [defendant], we're through. Your complaints

- 9 -

of her representation are ridiculous. The facts in this case, quite frankly, were outrageous. The fact that Ms. Riess had that jury out for as long as they [*sic*] did is a credit to her ability to represent you."

¶ 23     The trial court then considered and denied defendant's posttrial motion and proceeded with sentencing. As stated, the court sentenced defendant to concurrent prison sentences of five years for domestic battery, five years for aggravated battery, and one year for DWLR.

¶ 24     In September 2018, defendant filed a motion to reconsider his sentences, arguing they were excessive. In November 2018, the trial court denied defendant's motion.

¶ 25     This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27                         A. Sufficiency of the Evidence

¶ 28     On appeal, defendant first argues the State failed to prove him guilty of either domestic battery or aggravated battery beyond a reasonable doubt. Specifically, he contends the State's evidence failed to show that he caused bodily harm to Smith.

¶ 29     The State has the burden of proving each element of a charged offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. When considering a defendant's challenge to the sufficiency of the evidence on review, this court "must determine whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* "It is not the role of the reviewing court to retry the defendant," and it is the trier of fact's responsibility "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.*

¶ 30    On appeal, "[a] conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.* ¶ 36. Rather, reversal is warranted only when "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.* ¶ 35.

¶ 31    Here, defendant was charged with both domestic battery and aggravated battery. "A person commits domestic battery if he or she knowingly without legal justification *** [c]auses bodily harm to any family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2016). Additionally, as charged in this case, a person commits aggravated battery when, knowingly and without legal justification, he or she "causes bodily harm to an individual" while "on or about a public way." *Id.* § 12-3(a)(1), 12-3.05(c).

¶ 32    As stated, defendant argues the State failed prove that he caused bodily harm to Smith. He contends that although the State submitted photographs showing marks on Smith's body, Smith denied that those marks were caused by him and maintained that they "could" have been the result of her work. Additionally, defendant asserts that the State failed to "tie" eyewitness testimony that he struck or hit Smith "to any actual bodily harm" she sustained. Accordingly, he asserts his domestic battery and aggravated battery convictions must be reversed. We disagree.

¶ 33    "Although it may be difficult to pinpoint exactly what constitutes bodily harm ***, some sort of physical pain *or* damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." (Emphasis added.) *People v. Mays*, 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36 (1982). "In determining whether a defendant's actions caused bodily harm, direct evidence of injury may be considered or the trier of fact may infer injury based upon circumstantial evidence in light of common experience." *People v. Bishop*, 218 Ill. 2d 232, 250,

- 11 -

843 N.E.2d 365, 375, (2006).

¶ 34 At defendant's trial, three eyewitnesses testified to observing defendant repeatedly hit or strike Smith. Johnson, whom the evidence indicated was the first eyewitness on the scene, testified he observed defendant with his arm around Smith's neck and stated defendant was hitting Smith in the face. Johnson intervened and attempted to pull defendant's arm away from Smith's neck until defendant released her. Afterwards, Johnson observed that Smith's neck "looked a little red" and that she was acting "[l]ike she had sustained a hit that would hurt her." The Zollers, who also observed defendant hit or strike Smith multiple times, testified that after the altercation, Smith appeared disheveled and distraught. She also had marks on her shoulder and neck. Further, Thomas, a police officer who responded to the scene, testified Smith appeared disheveled and was upset and crying. Her hair was "messy," and she had marks on her face and chest that appeared "consistent with traumatic injury." One scratch above Smith's left eyebrow was "either recently bleeding or about to bleed."

¶ 35 Contrary to defendant's assertions on appeal, the above evidence was sufficient to support a reasonable inference that defendant's actions in striking, hitting, and placing his arm around Smith's neck caused Smith physical pain and damage to her body. Common experience dictates that an individual who had been struck, hit, and restrained in the manner described by the eyewitnesses in this case and who appeared as Smith did immediately after the altercation would have experienced physical pain. See *id.* (holding that a finding of bodily harm caused by the defendant could be inferred from a sexual assault victim's testimony "that when [the] defendant began to penetrate her anally, it caused her to cry"); *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 32, 26 N.E.3d 586 ("Although [the victim] did not explicitly testify that she felt physical pain

when [the defendant] was choking her, common experience dictates that [the victim] would have felt physical pain when she was involuntarily moved by [the defendant] who had his arm around her neck applying pressure to the point that it felt 'tight.' "). As stated, Smith was also described as having visible injury to her body immediately after the altercation, including redness around her neck and a mark on her face that looked as if it was about to bleed or had recently bled. A reasonable inference from such evidence was that those injuries to her body were fresh and caused by defendant's recent physical attack.

¶ 36    As defendant points out, contradictory evidence of bodily harm was presented through Smith's testimony and, in particular, her denial of any physical altercation with defendant or injury caused by him. Again, however, "[a] conviction will not be reversed simply because the evidence is contradictory ***." *Gray*, 2017 IL 120958, ¶ 36. In this instance, the State presented strong evidence that defendant caused Smith bodily harm when he struck, hit, and restrained her with his arm around her neck. Smith's testimony did not render that evidence so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. Accordingly, reversal is not warranted.

¶ 37                      B. DWLR Conviction

¶ 38    Defendant next argues that his DWLR conviction must be reduced from a Class 4 felony conviction to a misdemeanor conviction. He contends that DWLR is typically a misdemeanor offense and to establish application of a felony sentencing enhancement, the State was required to establish the basis for his drivers' license revocation. Defendant maintains the State failed to introduce such evidence either at his trial or sentencing. Additionally, although defendant acknowledges that he forfeited this issue by failing to raise it with the trial court at

- 13 -

sentencing, he maintains it may be reviewed under the plain-error doctrine.

¶ 39 "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010). However, forfeited claims of error may still be reviewed when the defendant establishes the occurrence of plain error. *Id.* at 545. To obtain relief under the plainerror doctrine, "a defendant must first show that a clear or obvious error occurred" and "then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* Here, we find no clear or obvious error.

¶ 40 Generally, under section 6-303(a) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/6-303(a) (West 2016)), a DWLR offense is a Class A misdemeanor. However, section 6-303(d) (*id.* § 6-303(d)) provides that a defendant commits a Class 4 felony offense when convicted of a second DWLR violation and the defendant's revocations were for a DUI offense under section 11-501 of the Vehicle Code (*id.* § 11-501).

¶ 41 "[W]here a statute initially sets forth the elements of an offense and separately provides sentencing classifications based on other factors, the enhancing factors do not create a new offense but serve only to enhance the punishment." *People v. Owens*, 2016 IL App (4th) 140090, ¶ 33, 59 N.E.3d 187. Consequently, the prior convictions set forth in section 6-303(d) "are not elements of the offense [of DWLR] that the State must prove to the trier of fact." *People v. Lucas*, 231 Ill. 2d 169, 181, 897 N.E.2d 778, 785 (2008); see also 725 ILCS 5/111-3(c) (West 2016) ([T]he fact of such prior conviction and the State's intention to seek an enhanced sentence are not elements of the offense and may not be disclosed to the jury during trial unless otherwise

permitted by issues properly raised during such trial."). Rather, "[t]he existence of the prior conviction[s] is used after a defendant's conviction to increase the classification of the crime at sentencing." *Lucas*, 231 Ill. 2d at 181.

¶ 42        Notably, "[t]he State is not subject to the same burden of proof at a sentencing hearing as it is during the guilt phase of a trial." *People v. Bailey*, 409 Ill. App. 3d 574, 592, 948 N.E.2d 690, 709 (2011). "[O]ur supreme court has not articulated a specific burden of proof at sentencing and instead maintains that 'relevance and reliability are the important factors in the consideration of evidence at sentencing.' " *Id.* (quoting *People v. Jackson*, 149 Ill. 2d 540, 549, 599 N.E.2d 926, 930 (1992)).

¶ 43        At sentencing, the trial court may properly consider a presentence investigation (PSI) report "to determine a defendant's criminal record" and "such a report is a reliable source for the purpose of inquiring into a defendant's criminal history." (Internal quotation marks omitted.) *Owens*, 2016 IL App (4th) 140090, ¶ 42. In *Owens*, this court held that it was reasonable for the trial court to infer the defendant's driver's license was revoked for DUI at the time of his DWLR offense where his PSI report reflected his prior DUI convictions, the PSI report did not show that the defendant's license was ever reinstated, and it was undisputed that the defendant's license was revoked at the time of the underlying DWLR offense. *Id.* ¶ 43. Similar circumstances are presented in the case at bar.

¶ 44        Here, defendant's PSI report showed a 2013 DUI conviction, his failure to pay fines or attend classes associated with that conviction, and that a "notice" was sent to the Illinois Secretary of State in connection with that offense. As argued by the State, the Vehicle Code provides that "[t]he Secretary of State shall revoke the driving privileges of any person convicted"

of a DUI offense. 625 ILCS 5/11-501.01(d) (West 2016). The PSI report further showed that in 2014, defendant was previously convicted of DWLR. Like in *Owens*, nothing in the record shows that defendant's license was ever reinstated following his DUI conviction and defendant does not dispute that his license was revoked in August 2017, at the time of the underlying DWLR offense. Under these circumstances, the trial court could reasonably infer that defendant's drivers' license was revoked following his DUI conviction and that the revocation remained in effect at the time of both of his DWLR offenses. Accordingly, on this record, defendant cannot establish the occurrence of plain error.

¶ 45                    C. Prosecutor's Comments During Closing Argument

¶ 46        On appeal, defendant further argues that comments made by the prosecutor during her closing argument deprived him of his right to due process and a fair trial. Specifically, he argues the prosecutor misstated the evidence presented at trial by presenting argument on the "cycle of abuse" in relationships and by asserting that he caused Smith to go to the hospital in February 2017.

¶ 47        Initially, defendant asserts these issues were properly preserved for appellate review because he (1) raised an objection during the State's closing argument on the ground that the prosecutor was arguing "facts not in evidence" and (2) challenged the trial court's decision to overrule that objection in his posttrial motion. Alternatively, he maintains that in the event we find forfeiture of his claims, they are reviewable "as first-prong plain error."

¶ 48        Here, the record shows defendant objected to argument by the prosecutor that his actions caused Smith's February 2017 hospital visit. He also raised the issue in his posttrial motion. Accordingly, that specific challenge to the prosecutor's closing argument has been properly

- 16 -

preserved. See *People v. Staake*, 2017 IL 121755, ¶ 30, 102 N.E.3d 217 (stating that to preserve an alleged trial error for appellate review, a defendant must object to the alleged error at trial and raise it in a posttrial motion).

¶ 49        However, defendant did not raise a complaint, either at trial or in his posttrial motion, regarding the prosecutor's "cycle of abuse" argument. Accordingly, defendant's challenge to that portion of the State's argument has been forfeited. Nevertheless, as defendant points out on appeal, this court may review a forfeited claim of trial error when the defendant shows "that a clear or obvious error occurred" and that the evidence was closely balanced. (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. The initial analytical step when conducting a plain error analysis is to determine "whether there was a clear or obvious error at trial." *Id.* ¶ 49. Additionally, "[a]bsent reversible error, there can be no plain error." *People v. Naylor*, 229 Ill. 2d 584, 602, 893 N.E.2d 653, 665 (2008).

¶ 50        In the context of closing arguments, prosecutors are accorded wide latitude. *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *Id.* On review, this court considers "the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Id.* Reversible error occurs where the prosecutor's remarks "constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction,

- 17 -

a new trial should be granted." *Id.*

¶ 51　　　　Here, Smith testified at trial that she and defendant had a dating relationship for 10 years. She acknowledged that, in the past and on more than one occasion, defendant had become "physical" with her and hit her. Regarding an incident in February 2017 when she went to the hospital, Smith initially testified that defendant "might've" become physical with her and agreed that she had "to go to the hospital for that." She reported that she did not recall whether defendant punched her or asked her to lie about her injury. Smith then conflictingly testified she was injured due to her own clumsiness. Further, she acknowledged that she still loved defendant and did not want bad things to happen to him.

¶ 52　　　　Based on this testimony, the prosecutor could have fairly commented during her closing argument that defendant had been physically abusive to Smith during the course of their relationship. The prosecutor could have also argued based on reasonable inferences drawn from the evidence that, due to her feelings for defendant, Smith elected to continue their relationship despite the abuse and to deny the allegations against him at trial. Given Smith's testimony, it was also not a misstatement of the evidence for the prosecutor to argue that defendant's actions caused Smith to seek medical treatment in February 2017.

¶ 53　　　　However, as argued by defendant, we find the prosecutor's remarks on the "cycle of abuse" in relationships went beyond the specific relationship between defendant and Smith and the evidence presented at trial. Specifically, the prosecutor began her closing argument as follows:

> "Every relationship has fights, has arguments. You leave dishes in the sink for too long even though the dishwasher is right next to it. You know, who's going to mow the lawn? Forgetting to pay bills. But when you're in a relationship that has the

cycle of abuse, those arguments, those fights, they get physical. He gets amazingly angry over something usually small, like a windshield and a car being dirty, for example, and flies into a rage. He hits, he punches, anything he can do to have power over her. If she gets too hurt, she may have to go to the hospital, and he threatens her, 'Don't you tell them how you got hurt.' So she'll go to the hospital to get help for medical treatment. Say I fell. I tripped down the stairs. I tripped and my face hit the door knob. We've all heard those—heard those excuses before. And then the next day he's a different person. It's all 'Oh, baby, I'm so sorry. I'll never do this again. You know, please stay with me,' and she stays. 'I'm so sorry. I'm never going to do it again,' and then it happens again. It's the cycle of abuse."

¶ 54    In *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 58, 115 N.E.3d 1207, the defendant challenged remarks made by the prosecutor during closing argument that "the cunning nature of sexual predators is something 'we' see on a daily basis." There, the prosecutor argued:

" '[Defense counsel] argues that [the defendant] must have been so cunning and so slick, he can do it over and over again and no one has a clue. Absolutely. We see that everyday in the news. We see that everyday, predators who pick out the perfect victim, the victim they know who is not going to tell on them, the victim they can do these things over and over again and no one is going to believe them or they are not going to tell anybody. That's not unheard of, ladies and gentlemen. We see it on a daily basis.' " *Id.* ¶ 59.

On review, we agreed that the remarks were improper, noting statements regarding how cunning or calculating sexual offenders are "was not presented as evidence in the trial." *Id.* ¶ 61. Further,

- 19 -

we rejected the State's assertion that the prosecutor was making a permissible comment on the jury's common knowledge, finding the comments "went beyond talking about daily experiences of jurors and their knowledge of sexual abuse" and "to matters outside of the trial." *Id.* We further stated as follows:

> "Had the State presented expert testimony to assist in exploring [the victim's] behavior *** the comments might have been admissible. [Citation.] Here, however, the State was inferring knowledge of the habits of sexual predators as a matter of common knowledge." *Id.* ¶ 61.

¶ 55        In this case, the prosecutor's "cycle of abuse" remarks are similar to those at issue in *Stevens*. The State did not present any evidence at trial regarding the patterns or characteristics of abusive relationships and improperly "inferr[ed] knowledge of [abusive relationships] as a matter of common knowledge." See *id.* Accordingly, the prosecutor's "cycle of abuse" remarks were improper.

¶ 56        Although we agree with defendant that the prosecutor made improper remarks, we also find that those remarks did not cause him substantial prejudice and, thus, reversal is unwarranted. The evidence against defendant was overwhelming. It showed Smith called 911 and reported an argument with her ex-boyfriend, whom she identified as defendant by name. Smith asserted defendant had left the scene but was "driving back." She asked the 911 dispatcher to "please hurry up and send somebody" because defendant was "gonna go crazy." On the recording of the 911 call, noises consistent with a scuffle or altercation can be heard along with Smith repeatedly saying "get away from me" and then the word "stop." Around the same time as the 911 call and at Smith's reported location, several witnesses observed a man restraining and hitting or

striking a woman they identified as Smith. Witnesses stopped their vehicles to aid Smith and one tried to remove defendant's arm from around Smith's neck. Two eyewitnesses identified defendant as Smith's assailant, and a responding police officer identified defendant as the individual he saw driving away from the scene. After the altercation, Smith was disheveled, crying, and observed with marks on her body, some of which appeared recent. Although at trial Smith denied being hit or struck by defendant, her credibility was called into question by recordings from a responding police officer's body camera, showing Smith nodding in affirmation as eyewitnesses described Smith being hit by defendant. According to the responding police officer, Smith never denied being struck.

¶ 57    Given the strength of the evidence against defendant, we find the prosecutor's "cycle of abuse" remarks cannot be said to have contributed to his convictions or resulted in an unfair trial. See *People v. Johnson*, 114 Ill. 2d 170, 199, 499 N.E.2d 1355, 1368 (1986) ("In view of the entire record and the overwhelming evidence of [the] defendant's guilt, we cannot say that the improper comment either constituted a material factor in defendant's convictions or otherwise prevented him from receiving a fair trial so as to require reversal."). As a result, there was neither reversible error nor plain error.

¶ 58                              D. Rule 431(b) Questioning

¶ 59    Defendant next argues the trial court erred in the manner in which it admonished and questioned potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, he contends the court improperly "collapsed" the four principles set forth in the rule into one single statement of law before questioning the jurors' understanding and acceptance of those principles. Again, defendant acknowledges that he forfeited this issue by failing to raise it

with the trial court but asserts it may be reviewed as first-prong plain error.

¶ 60        As stated above, the first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. Central to defendant's claim of error is Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), which sets forth certain requirements for the trial court when questioning prospective jurors during *voir dire*. It provides as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." *Id.*

The trial court's compliance with Rule 431(b) is subject to *de novo* review. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693.

¶ 61        In *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010), the supreme court held that "Rule 431(b) is clear and unambiguous." It set forth the requirements of Rule 431(b) as follows:

> "Rule 431(b) *** mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the

principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.* The court then found noncompliance with the rule in the case before it based on the trial court's failure to address one of the four Rule 431(b) principles and its failure to ask prospective jurors whether they accepted another principle. *Id.*

¶ 62 In this case, the trial court admonished and questioned prospective jurors as to Rule 431(b) in panels of four. It first recited the four principles to each panel and then immediately asked, first, whether the jurors "underst[ood]" the principles and, second, whether they "accept[ed]" those principles. The record, therefore, shows "a specific question and response" method of inquiry employed by the court. *Id.* The court explicitly recited all four principles and permitted each juror the opportunity to respond to questions regarding whether he or she understood and accepted the principles. Under these circumstances, we find compliance with the rule.

¶ 63 As indicated, defendant argues the trial court improperly "collapsed" or "commingled" the four principles by reading them together before questioning each panel of four jurors. His argument suggests that courts are required to separately recite and question jurors' understanding and acceptance of each of the four principles. However, this court has previously rejected the precise arguments raised by defendant on appeal regarding the improper "collapsing" of the Rule 431(b) principles and determined that defendant's proposed method of inquiry is not required by either Rule 431(b) or relevant supreme court case authority See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 62 (finding "*Thompson* does not interpret Rule 431(b) as requiring a

process wherein the court addresses each principle 'separately' " and "Rule 431(b) also contains no such requirement"). For the same reasons set forth in *Kinnerson*, we reject defendant's challenge to the court's Rule 431(b) method of inquiry in this case.

¶ 64   Moreover, even if we were to find the occurrence of a clear or obvious error, which we do not, defendant cannot establish that the evidence in the case was closely balanced. As set forth above, the evidence of defendant's guilt was overwhelming. Under these circumstances, we do not find plain error.

¶ 65                          E. *Krankel* Inquiry

¶ 66   On appeal, defendant additionally challenges the trial court's response to his *pro se* posttrial claims of ineffective assistance of counsel. He contends the court's inquiry into his claim that his counsel failed to investigate alibi witnesses was insufficient because the court did not ask about the identity of his claimed witnesses, what they would have testified to, or whether they were available for trial. He asks this court to remand his case to the trial court for further inquiry.

¶ 67   Pursuant to the supreme court's decision in *Krankel*, 102 Ill. 2d 181, and the cases that followed it, "when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must conduct an inquiry into the factual basis of the defendant's claim to determine whether new counsel should be appointed to assist the defendant." *People v. Wilson*, 2019 IL App (4th) 180214, ¶ 18, 137 N.E.3d 868. A *Krankel* inquiry is triggered when a defendant brings his or her *pro se* claims to the trial court's attention. *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631, 638 (2003). When conducting such an inquiry, the trial court should engage in the following procedure:

"[T]he trial court should first examine the factual basis of the defendant's claim. If

the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citations.] The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance." *Id.* at 77-78.

¶ 68 "During [the trial court's] evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* at 78. However, "[a] brief discussion between the trial court and the defendant may be sufficient." *Id.* at 78-79. Additionally, the court can further rely "on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 69 On review, the operative concern for this court "is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id.* at 78. Whether the court properly conducted a preliminary *Krankel* inquiry is reviewed *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28, 25 N.E.3d 1127.

¶ 70 Here, at the outset of defendant's sentencing hearing, Riess, defendant's counsel, informed the court that he had complaints about her representation. The court then asked defendant about his complaints and defendant responded that Riess "ha[d]n't represented [him]" and failed to investigate his alibi witnesses. The court expressed doubt that Riess's alleged deficient performance could have been prejudicial to defendant given the "overwhelming" evidence of his

guilt and found Riess had represented him to the best of her ability under the circumstances. The court then received information from Riess that defendant did not inform her of any alibi witnesses until after his trial. Following that assertion, the court determined defendant's ineffective-assistance claims were "ridiculous."

¶ 71 We find the trial court conducted an adequate inquiry into defendant's *pro se* ineffective-assistance allegations. The court questioned defendant to determine the basis of his complaints about Riess's performance, received information from Riess regarding defendant's allegations, and relied on its own knowledge of Riess's performance. Although the court could have asked additional questions of defendant regarding his alibi-witness claim, under the circumstances presented, including Riess's direct contradiction of that claim, the court's failure to do so did not render its inquiry inadequate.

¶ 72 F. One-Act, One-Crime Rule

¶ 73 Finally, on appeal, defendant argues his convictions for both domestic battery and aggravated battery violate the one-act, one-crime rule. He alleges both of those crimes were based on the single act of knowingly causing bodily harm to Smith and, as a result, his aggravated battery conviction should be vacated. The State concedes this issue.

¶ 74 Under the one-act, one-crime rule, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11, 104 N.E.3d 1102. "[A]n 'act' [is] any overt or outward manifestation that will support a separate offense." *People v. Crespo*, 203 Ill. 2d 335, 341, 788 N.E.2d 1117, 1120 (2001). "For the State to properly obtain multiple convictions for connected acts that might be treated as a series of offenses, the State must apportion the acts to the offenses in the charging

- 26 -

instrument and at trial." *People v. Williams*, 384 Ill. App. 3d 327, 340, 892 N.E.2d 620, 632 (2008) (citing *Crespo*, 203 Ill. 2d at 345). "Whether a violation of the rule has occurred is a question of law, which we review *de novo*." *Coats*, 2018 IL 121926, ¶ 12.

¶ 75    Here, there is no dispute between the parties that the State treated defendant's conduct as a single act. Although witnesses testified defendant had his arm around Smith's neck and struck her multiple times, the State did not differentiate between his physical actions against Smith either in the charging instrument or at trial. Instead, it charged and tried defendant for the same physical act under different theories of criminal culpability. Accordingly, we agree with defendant and accept the State's concession that defendant's two battery-related convictions violate the one-act, one-crime rule and that one must be vacated.

¶ 76    "[U]under the one-act, one-crime doctrine, sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170, 902 N.E.2d 677, 686 (2009). "In determining which offense is the more serious, a reviewing court compares the relative punishments prescribed by the legislature for each offense." *Id.* "However, in situations where the degree of the offenses and their sentencing classifications are identical, [the supreme] court has also considered which of the convictions has the more culpable mental state." *Id.* at 170-71. "[W]hen it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded to the trial court for that determination." *Id.* at 177.

¶ 77    Initially, we note that defendant asserts, without analysis, that his aggravated battery conviction must be vacated. The State agrees on the basis that the aggravated battery offense was a lesser-included offense of domestic battery.

- 27 -

¶ 78        The abstract elements approach is used to determine whether one offense is a lesser-included offense of another when the issue "arises in the context of a one-act, one-crime issue where the defendant was convicted of both offenses[.]" *Coats*, 2018 IL 121926, ¶ 30. "Under the abstract elements approach, a comparison is made of the statutory elements of the two offenses." *People v. Miller*, 238 Ill. 2d 161, 166, 938 N.E.2d 498, 502 (2010). "If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *Id.*

¶ 79        Here, as charged in this case, "[a] person commits domestic battery if he or she knowingly without legal justification *** [c]auses bodily harm to any family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2016). Alternatively, a person commits aggravated battery when, knowingly and without legal justification, he or she "causes bodily harm to an individual" while "on or about a public way." *Id.* § 12-3(a)(1), 12-3.05(c). Both offenses contain an element not included within the other offense, *i.e.*, bodily harm to a "household or family member" in the case of domestic battery and being "on or about a public way" in the case of aggravated battery. Accordingly, neither was a lesser-included offense of the other.

¶ 80        We also find that, in this case, it cannot be determined which of defendant's two challenged convictions is the more serious offense. Both were Class 3 felonies that subjected defendant to the same range of penalties. See *id.* § 12-3.2 (b) (stating domestic battery is a Class 3 felony if the defendant has three prior domestic battery convictions); *Id.* § 12-3.05(h) (defining aggravated battery as a Class 3 felony unless otherwise provided). Additionally, both offenses required defendant to act "knowingly," and, thus, required the same mental state. Under these

circumstances, we remand the matter to the trial court for a determination of which offense should be vacated under the one-act, one-crime rule.

¶ 81                                    III. CONCLUSION

¶ 82        For the reasons stated, we remand to the trial court with directions that it determine which of defendant's two battery-related convictions to vacate as the less serious offense pursuant to the one-act, one-crime rule. We otherwise affirm the trial court's judgment.

¶ 83        Affirmed in part; cause remanded with directions.